## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| STATE FARM FIRE AND CASUALTY COMPANY, | : | CIVIL ACTION No.: |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| DAVID W. BROWN, KIMBERLY BROWN, IDIN INTERNATIONAL, LTD individually and t/d/b/a CAMINO BOOKS, and CAMINO BOOKS, INC | : | |
| | : | |
| Defendants. | : | |

## COMPLAINT FOR DECLARATORY JUDGMENT

Plaintiff, State Farm Fire and Casualty Company ("State Farm"), by and through its undersigned counsel, Kennedys CMK LLP, as and for its Complaint for Declaratory Judgment states as follows:

### THE PARTIES

1.     Plaintiff in this action is State Farm which is a wholly-owned subsidiary of State Farm Mutual Automobile Insurance Company, an Illinois mutual insurance company, having its principal place of business at One State Farm Plaza, Bloomington, Illinois, 61710-0001. State Farm is licensed to issue, and does in fact issue, insurance policies in the Commonwealth of Pennsylvania.

2.     Defendant David W. Brown ("Brown") is an adult male individual and citizen of the Commonwealth of Pennsylvania, residing at 417 Carpenter's Cove Lane, Downingtown, PA 19335-4540.

3.     Defendant Kimberly Brown is an adult individual and a citizen of the Commonwealth of Pennsylvania residing at 417 Carpenter's Cove Lane, Downingtown, PA 19335-4540.

4.      Defendant Kimberly Brown is a Named Insured on the State Farm Policy discussed below.  State Farm is not aware of any claim it presently might have against Kimberly Brown, and has only joined Kimberly Brown because of her status as a Named Insured on a policy that is the subject of this litigation.

5.      Defendant IDINT International, Ltd ("IDINT") has appeared in the Underlying Actions and has asserted a claim against Brown in the Underlying Actions despite it's denial that it is an operating business. On information and belief IDINT is subject to service at Camino Books, Inc's place of business at 1518 Walnut Street, Suite 1600, Philadelphia, Pennsylvania, 19102.

6.      Camino Books, Inc., ("Camino") has a place of business at 1518 Walnut Street, Suite 1600, Philadelphia, Pennsylvania, 19102

7.      State Farm issued a Homeowners policy of insurance to Brown which insurance is more fully described below.

8.      The scope of the coverage available to the Defendants is governed by the terms, conditions, exclusions and endorsements of the policy.

**JURISDICTION AND VENUE**

9.      This is an action for declaratory judgment pursuant to 28 U.S.C. § 2201 and Rule 57 of the Federal Rules of Civil Procedure.

10.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332 (a), as this action is between citizens of different states and the amount in controversy exceeds $75,000.

11.      Venue is proper in the Eastern District of Pennsylvania pursuant to 28 U.S.C. § 1391 (a) as the defendants reside in the Eastern District of Pennsylvania and many of the events at issue took place in the Eastern District of Pennsylvania.

**NATURE OF THE ACTION**

12.     Brown has been sued by Ronald W. Savage ("Savage") in an action entitled *Ronald W. Savage v. IDINT International, Ltd. Individually and t/d/b/a Camino Books, Camino Books, Inc., and David W. Brown*, Docket No. 17-00206, pending in the Court of Common Pleas for Lancaster County, Pennsylvania ("Savage Complaint").  A true and correct copy of the Savage Complaint is attached hereto as Exhibit A.

13.     Brown has also been sued by John M. Bowman ("Bowman") and Theresa L. Bowman in an action entitled *John M. Bowman and Theresa L. Bowman h/w v. IDINT International, Ltd. Individually and t/d/b/a Camino Books, Camino Books, Inc., and David W. Brown*, Docket No. 17-00210, pending in the Court of Common Pleas for Lancaster County, Pennsylvania ("Bowman Complaint").  A true and correct copy of the Bowman Complaint is attached hereto as Exhibit B.

14.     In its response to the both the Savage Complaint and the Bowman Complaint, Camino and IDINT filed crossclaims against Brown for contractual and common law indemnification (collectively the "IDINT and Camino Crossclaims").  True and correct copies of the IDINT and Camino Crossclaims are attached hereto as Exhibit C.   (The Savage Complaint, the Bowman Complaint and the IDINT and Camino Crossclaims are herein collectively defined at the "Underlying Action").

15.     In this action, State Farm seeks a determination of its rights and obligations to defend and indemnify Brown for the allegations of the Savage Complaint, the Bowman Complaint and the IDINT and Camino Crossclaims under the Homeowners policy of insurance 78-N5-8834-2 for the policy period November 30, 2015 to November 30, 2016 issued to Brown and Kimberly Brown.

16.     In this action, State Farm seeks a determination of its rights and obligations to defend and indemnify IDINT and Camino for the allegations of the Savage Complaint and the

Bowman Complaint under the Homeowners policy of insurance 78-N5-8834-2 for the policy period November 30, 2015 to November 30, 2016 issued to Brown and Kimberly Brown.

## THE SAVAGE COMPLAINT

17.    The Savage Complaint alleges that Brown is an adult individual who co-authored a book entitled "Love, Murder, and Corruption in Lancaster County."  Exhibit A, ¶¶ 4-5.

18.    Savage alleges that Savage was a police officer assigned to the investigation of the death of Laurie Show which took place on December 20, 1991.  Exhibit A, ¶¶ 24-25.

19.    Lisa Michelle Lambert ("Lambert") was convicted of this murder on July 20, 1992. Exhibit A, ¶ 24.

20.    The Savage Complaint alleges:

> 26. At all times relevant hereto, Plaintiff - Ronald W. Savage has enjoyed not only the confidence of his official superiors in the police department which he was, and has been a member, but the esteem and respect of all who knew him and of the community in general. Plaintiff has never been guilty of the crimes of rape, perjury, tampering, false reports, false swearing, false reports to law enforcement officer, tampering with or fabricating physical evidence, tampering with public records or information, intimidation of witnesses or victims, or obstructing the administration of law or other governmental functions, or any similar offenses, but he has on the contrary always discharged his duties with strict integrity.
>
> Exhibit A, ¶ 26.

27.    The Savage Complaint alleges that beginning in 2011 and continuing through the beginning of 2016, Brown was aware that Savage had never been guilty of any crime, offense or violation of law.  Exhibit A, ¶ 28.

28.    The Savage Complaint alleges that Brown co-authored "Love, Murder, and Corruption in Lancaster County" the publication of which has brought public scandal and disgrace upon Savage and deprived him of his good name. *See* Exhibit A, ¶ 28.

29.     It is alleged that the book was published with an intent to injure Savage and to deprive him of fame, credit, reputation.  Exhibit A, ¶ 28.

30.     The Savage Complaint alleges that the intention of the charges against Savage in "Love, Murder, and Corruption in Lancaster County" was malicious, wicked and illegal. Exhibit A, ¶ 28.

31.     All of this was accomplished by the publication of the book "Love, Murder and Corruption in Lancaster County" on or about February 15, 2016.  Exhibit A, ¶ 28.

32.     The complaint alleges eleven specific paragraphs of the book which call into question Savage's integrity and accuse him of participating willfully in the wrongful conviction of co-author Lambert:

> 28. Beginning in 2011, and continuing through the beginning of 2016, Brown, Amoroso, Martinez, E.S. Borgeson and Associates, Borgeson, PearsonKoutcher, LLP, Pearson, and Koutcher, well knowing that Plaintiff - Ronald W. Savage has never been guilty of any crime, offense or violation of the law, nor was he ever an accessory to, nor an aider and abettor of, criminal acts, but he has at all times been a peaceable and law abiding inhabitant of the several communities in which he has resided from the day of his birth to the present, and with the intent to injure Plaintiff - Ronald W. Savage and to bring him into public scandal and disgrace, and to deprive him of his good name, and intending to injure Plaintiff - Ronald W. Savage and deprive him of his fame, credit and reputation, maliciously, wickedly and illegally wrote and published the book "Love, Murder, and Corruption in Lancaster County", containing the following scandalous, defamatory and libelous statements:
>
>> A. "In the absence of incriminating evidence against me, Detective Savage employed a teenage girl named Laura Thomas to do his dirty work. Laura had filed a false report that she was kidnapped, and she was in serious trouble with the police- she was a 17-year old facing a prison term. By using the threat of prison as leverage, Savage secured her promise to give false testimony at my trial in exchange for disposing of her legal trouble. Laura's charge was reduced to disorderly conduct, and her fines and costs totaled $115- a slap on the wrist";
>>
>> B. "We didn't know that Laura Thomas had just fabricated an elaborate story that she was assaulted and kidnapped, and reported this lie to the police. We didn't know that Detective Savage had subsequently secured her false testimony in

exchange for treating her crime of filing a false police report as though it were a parking ticket. That was before we knew that the police blackmailed witnesses.

Laura's father, a man I'd never seen before, supported his daughter's testimony. Mr. Thomas had a hidden motive that we would later discover: he took the stand at the behest of Detective Savage to bolster his daughter's testimony and keep her out of prison."

C. "I heard Tina take a deep breath. The suspense was eating at me. 'Lisa, they had a secret meeting last night about the June 17 rape. They know. From what I've been able to ascertain, Chief Jerchau, Lieutenant Schuler, Assistant District Attorney Ken Brown, County Detective Solt, District Magistrate Ronald Savage, and the sergeant we suspect were there, in addition to the police officer who raped you.'"

D. "Detective Ronald Savage, now a district magistrate, had written in his report that the rope was completely buried under the ice, a lie supporting the idea that the rope was not associated with the bloodhound."

E. "But Smokey Roberts had been a witness at the river search, and like Allen Means, he felt duty-bound to reveal the truth caught on the original tape: that, from the beginning, the police, detectives, and others had entered into a conspiracy to frame me for the murder to Laurie Show."

F. "Further, the dying declaration was proved to be medically impossible. Detective Ronald Savage had fabricated his own notes by falsely claiming that he'd interviewed the medical personnel at the murder scene. But my lawyers had learned the identity of these medically trained witnesses during the course of their exhaustive investigation, and what the medics had seen was astounding; three of them, Kenneth M. Zeyak, Kathleen Allison Harrison, and Charles R. May, had all noticed that Laurie Show's left carotid artery was severed - making speech and the "dying declaration," out of the question. Roy Shirk, my 1992 Trial Attorney, had never known of this evidence. Jack Kenneth had suppressed the information and had undoubtedly enlisted Detective Savage's assistance to make the three people vanish from the record.

G. "The District Court deduced that Savage had essentially blackmailed Laura Thomas into doing his bidding by using the threat of a year in prison. Savage elicited her false testimony against me in exchange for a lesser charge. I have no doubt that Savage scared the hell out of Laura Thomas by telling her about the horrors she would suffer in prison. I know better than anyone how terrified she must have been."

H. "Savage took the stand again and coolly testified that he'd had no knowledge that Mrs. Show had seen Lawrence fleeing the murder scene. It was a blatant lie. Savage had everything to lose: his reputation, his credibility, his livelihood, and his freedom. He would have faced serious charges if he had admitted to perjury, tampering with a witness, suppression of evidence, and tampering with evidence."

I. "Before Savage took the stand that day, Lewis rose and boldly assured Dalzell that his client would tell the truth. Savage broke that vow quickly when he contradicted Laurie's mother's testimony by stating that she did not tell him that she saw Lawrence fleeing the condominium complex in his car the morning of the murder. It was a bald-face lie, and Lewis had to know it. Savage was one of the many law enforcement officials from Lancaster whom Dalzell later referred to the U.S. Attorney's Office for their illegal actions. He should have added Lewis to the list."

J. "Jay Smith's and Lisa's cases had striking similarities. Both were very high-profile cases in which the prosecutors and police were under substantial pressure to obtain convictions, and because the evidence against their suspects was scant, they lied and cheated to obtain guilty verdicts. It was a team effort in both cases to railroad the person they so desperately needed to convict. Kenneff, Weaver, and Savage were the engineers of the train in Lisa's case; Guida and Holtz steered the train in Smith's case."

K. "While Lawrence denied that he was ever in the condominium complex- according to him, he dropped off Lisa and Tabby on Oakview Road a quarter mile away and picked them up there- Hazel Show flatly refuted this assertion by testifying before Dalzell that she saw Lawrence leaving the complex in his car. She also said that, when she told Detective Savage she had seen Lawrence, he urged to not to focus on it. Neighbor Kathleen Bayan also observed Lawrence driving away from the complex."

Brown, Amoroso, Martinez, E.S. Borgeson and Associates, Borgeson, PearsonKoutcher. LLP, Pearson, and Koutcher published the book "Love, Murder, and Corruption in Lancaster County" through the publishing company of the Co-Defendants, IDINT International, LTD, d/b/a Camino Books, and Camino Books, Inc., and the book "Love, Murder, and Corruption in Lancaster County" was published on or about February 15, 2016. A true and correct copy of the portions of the book "Love, Murder, and Corruption in Lancaster County" which contain the scandalous, defamatory, and libelous statements, are attached hereto, made a part hereof and incorporated herein as Exhibit "B".

Exhibit A, ¶ 28.

33.     The Savage complaint accuses Savage of various intentional actions that lead to wrongfully convict the allegedly innocent Lambert.  *See* Exhibit A.

34.     The Savage Complaint also asserts that Brown knew or should have known that the material he published was not true.  *See* Exhibit A.

## THE BOWMAN COMPLAINT

35.     The Bowman Complaint also alleges that Brown is an adult individual who co-authored a book entitled "Love, Murder, and Corruption in Lancaster County."  Exhibit B, ¶¶ 4-5.

36.     Bowman alleges that at the time of Show's murder he was a police officer assigned to the investigation of her death which took place on December 20, 1991.  Exhibit B, ¶¶ 24-25.

37.     The Bowman Complaint alleges that beginning in 2011 and continuing through the beginning of 2016, Brown was aware that Bowman had never been guilty of any crime, offense or violation of law.  Exhibit B, ¶ 28.

38.     The Bowman Complaint alleges that Brown co-authored "Love, Murder, and Corruption in Lancaster County" the publication of which has brought public scandal and disgrace upon Bowman and deprived him of his good name.  *See* Exhibit B, ¶ 28.

39.     It is alleged that the book was published with an intent to injure Bowman and to deprive him of fame, credit, reputation.  Exhibit B, ¶ 28.

40.     The Bowman Complaint alleges that the intention of the charges against Bowman in "Love, Murder, and Corruption in Lancaster County" was malicious, wicked and illegal.  Exhibit B, ¶ 28.

41.     The offending sections of the book concern allegations that Bowman was part of a rape of Lambert and acted to cover up the rape and convict Lambert of the crime of murder of Show, specifically alleging:

> "At the federal hearing we had exposed Robin Weaver as one of the rapists. We had also established several truths about John Bowman: (1) Roy Shirk had positively identified Bowman as a dead ringer for one of my attackers after seeing the sketch I'd made in December 1991. The sketch had been marked as an exhibit and officially admitted as evidence at the federal hearing. (2) My mother had confirmed that identification, and she was adamant that it was Bowman who had come to the front door of the blue house around Halloween of 1991, identified himself as an East Lampeter Township Police Officer, interrogated her, and attempted to extract information about my whereabouts. He'd made the comment that I was indeed pregnant and stated '"those hips are really spreading." She had testified about this chilling encounter. (3) Mike Pawlikowski had identified Bowman as the uniformed police officer I'd been afraid of at the Catholic High festival in the summer of 1991. (4) Lastly, Bowman was specifically ordered to attend the secret meeting about the June 17 rape, and despite the mandatory logs that cops keep, he'd never before been able to manufacture an alibi for the night of the attack. Ironically, it was also Bowman who'd slipped and mentioned the clandestine gathering, as well as the names of all those in attendance, under questioning during his sworn deposition.
>     Now, with the sudden production of a seven-year-old sales receipt – and the appearance of a beautiful, blond-haired wife to "authenticate" it - the prosecution sought to erase these truths. Bowman's own actions had placed him under suspicion. Despite the evidence pointing to Bowman as one of the rapists, Tina chose to be cautious and told Stengel that she and Peter were no longer asserting this."

Exhibit B, ¶ 28.

42.     The Bowman Complaint also contains a cause of action on behalf of Bowman's wife alleging loss of consortium.  *See* Exhibit B.

## THE IDINT AND CAMINO CROSSCLAIMS

43.     Underlying co-defendants IDINT and Camino filed a crossclaim against Brown in both the Savage and Bowman actions pursuant to the Publishing Agreement dated February 4, 2014.  *See* Exhibit C.

44.     IDINT and Camino have also asserted crossclaims pursuant to Pa.R.C.P. 1031.1. *See* Exhibit C.

45.     The IDINT and Camino Crossclaims allege that, pursuant to the Publication Agreement, Brown had an obligation to hold harmless and defend IDINT and Camino and its licensees for the claims arising from the publication of "Love, Murder, and Corruption in Lancaster County". *See* Exhibit C.

46.     Section 4 paragraph 11 of the Publication Agreement between Lambert, Brown and Camino, provides:

> Author's Warranties
>
> 11.     The Author warrants that he has full power to make this agreement; and that the work has not previously been published in any form; that all rights conveyed to the publisher are free of encumbrance; and that the work does not violate any copyright or any other right and contains nothing libelous or otherwise unlawful.  The Author will hold harmless and defend the publisher and its licensees against all claims, demands, or suits related to these warranties.
>
> The Author will compensate the publisher for any loss or damage, and for any sums payable in settlement of any claim or judgment, including counsel fees, resulting from a breach or alleged breach of such warranties.  The Author and the publisher will promptly notify each other of any claim, demand or suit. The Author and the publisher agree to cooperate fully in defense of any claim or action and the publisher shall have the right to withhold payments due to the author under this or any other agreement between them as security for the author's obligations set forth above.  These warranties and indemnitees will survive in the event this agreement is terminated.
> A true and correct copy of the Publication Agreement is attached
>
> hereto as Exhibit D.

47.     The agreement is executed by Lambert and Brown but does not appear to be executed by Camino.  *See* Exhibit D.

48.     According to the agreement, Lambert and Brown warranted that they did not violate any copyright or any other right and that the book contained nothing libelous or otherwise unlawful.  *See* Exhibit D.

49.     The IDINT and Camino Crossclaims further assert that both Lambert and Brown as authors of the work further promised in the agreement to hold harmless and defend Camino and its licensees against all claims, demands, suits and warranties.  *See* Exhibit C.

## STATE FARM POLICIES

50.     State Farm issued Homeowners Policy to Brown and Kimberly Brown bearing policy number 78-N5-8834-2 ("Policy"). The Policy was on the risk for the period November 30, 2015 to November 30, 2016.  A true and correct certified copy of the Policy is attached hereto as Exhibit E.

51.     The Insuring Agreement of the State Farm Policy states:

COVERAGE L – PERSONAL LIABILITY

If a claim is made or a suit is brought against an insured for damages because of bodily injury or property damage to which this coverage applies, caused by an occurrence, we will:

1.  pay up to our limit of liability for the damages for which the insured is legally liable; and

2.  we provide a defense at our expense by counsel of our choice.  We may make any investigation and settle any claim or suit that we decide is appropriate.  Our obligation to defend any claim or suit ends when the amount we pay for damages, to effect settlement or satisfy a judgment resulting from the occurrence, equals our limit of liability....

Exhibit E.

52.     Endorsement FE-7468 to the State Farm Policy states:

COVERAGE L-PERSONAL LIABILITY

The first paragraph is replaced with the following:

If a claim is made or a suit is brought against an insured for damages because of bodily injury, personal injury, or property damage to which this coverage applies, caused by an occurrence, we will:

Exhibit E.

53.     The Policy contains the following definition of bodily injury:

1. "bodily injury" means physical injury, sickness, or disease in a person. This includes required care, loss of services and death resulting therefrom.

   Bodily injury does not include:

   a. any of the following which are communicable: disease, bacteria, parasite, virus, or other organism, any of which are transmitted by any insured to any other person;

   b. the exposure to any such disease, bacteria, parasite, virus, or other organism by any insured to any other person; or

   c. emotional distress, mental anguish, humiliation, mental distress, mental injury, or any similar injury unless it arises out of actual physical injury to some person.

Exhibit E.

50.    The Policy also includes the following exclusion for intentional acts of the insured:

1. Coverage L and Coverage M do not apply to:

   a. **bodily injury** or **property damage**:

      (1) which is either expected or intended by the **insured**; or

      (2) which is the result of willful and malicious acts of the **insured**;

Exhibit E.

51.    The Policy also includes the following business pursuits exclusion:

Coverage L and Coverage M do not apply to:

a. bodily injury or property damage arising out of business pursuits of any insured or the rental or holding for rental of any part of any premises by any insured. This exclusion does not apply:

   (1) to activities which are ordinarily incident to non-business pursuits;

   (2) with respect to Coverage L to the occasional or part-time business pursuits of an insured who is under 19 years of age;

   (3) to the rental or holding for rental of a residence of yours:

(a) on an occasional basis for the exclusive use as a r residence;

(b) in part, unless intended for use as a residence by more than two roomers or boarders; or

(c) in part, as an office, school, studio or private garage;

(d) when the dwelling on the residence premises is a two, three or four-family dwelling and you occupy one part and rent or hold for rental the other part; or

(e) to farm land (without buildings), rented or held for rental to others, but not to exceed a total of 500 acres, regardless of the number of locations.

Exhibit E.

54.    Endorsement FE-3518 of the Policy contains the following definition of "occurrence":

7.  "occurrence", when used in Section II of this policy, means an accident, including exposure to conditions, which first results in:

a.  bodily injury; or

b.  property damage;

during the policy period. All bodily injury and property damage resulting from one accident, series of related accidents or from continuous and repeated exposure to the same general conditions is considered to be one occurrence.

Exhibit E.

52.    Endorsement FE-7468.4 also modifies the definition of occurrence. The endorsement provides:

The following is added to "occurrence":

Occurrence also means the commission of an offense, or series of similar offenses, which result in personal injury during the policy period. All personal injury resulting from on offense, series of similar offenses or from continuous and repeated exposure to the same general condition is considered one occurrence.

Exhibit E.

53.     The complete occurrence definition after combining endorsement FE-3518 and FE-7468.4 provides:

> 7. "occurrence", when used in Section II of this policy, means an accident, including exposure to conditions, which first results in:
>
> a. bodily injury; or
>
> b. property damage;
>
> during the policy period. All bodily injury and property damage resulting from one accident, series of related accidents or from continuous and repeated exposure to the same general conditions is considered to be one occurrence.
>
> Occurrence also means the commission of an offense or series or similar offenses which result in personal injury during the policy period.   All personal injury resulting from one offense, series of similar offenses or from continuous or repeated exposure to the same general conditions is considered to be one occurrence.

*See* Exhibit E.

54.     The policy endorsement FE-7468.4 also defines personal injury as:

> Personal injury means injury arising out of one or more of the following offenses:
>
> a. False arrest, false imprisonment, wrongful eviction, wrongful detention, malicious prosecution; or
>
> b. Libel, slander, defamation of character or invasion of rights of privacy.

Exhibit E.

55.     Endorsement FE-7468.4 also adds exclusions for personal injury claims.   The following exclusions are added to the policy:

> 1. to liability assumed by any insured under any contract or agreement;
>
> \*              \*              \*
>
> 3. to injury sustained by any person as a result of an offense directly or indirectly related to the employment of that person by any insured;
>
> 4. to injury arising out of the business pursuits of any insureds;
>
> \*              \*              \*

7. when you act with specific intent to cause harm or injury;

8. to any person or property which is the result of your vocal and malicious act, no matter at whom the act was directed;

9. to libel, slander, or defamation of character if the first injurious publication or utterance of the same or similar material was made by any insured prior to the effective date of this endorsement;

Exhibit E.

55. State Farm is presently defending Brown under a reservation of rights. A true and correct copy of the Reservation of Rights letter is attached hereto as F.

## COUNT I – NO BODILY INJURY, PERSONAL INJURY OR PROPERTY DAMAGE

56. State Farm incorporates herein by reference the allegations set forth in paragraphs 1 through 55 inclusive, as if the same were fully set forth at length.

57. The State Farm Policy only responds for claims for bodily injury, personal injury or property damage.

58. The Savage Complaint does not allege a claim for bodily injury as defined in the State Farm Policy.

59. The Bowman Complaint does not allege a claim for bodily injury as defined by the State Farm Policy.

60. The Savage Complaint does not allege a claim for personal injury, as defined in the State Farm Policy.

61. The Bowman Complaint does not allege a claim for personal injury, as defined in the State Farm Policy.

62. The Savage Complaint does not allege a claim for property damage as defined in the State Farm Policy.

63. The Bowman Complaint does not allege a claim for property damage as defined in the State Farm Policy.

64.    The IDINT Crossclaim claim does not allege a claim for bodily injury, as defined in the State Farm Policy.

65.    The IDINT Crossclaim does not allege a claim for property damage, as defined in the State Farm Policy.

66.    The IDINT Crossclaim does not allege a claim for personal injury, as defined in the State Farm Policy.

67.    The Camino Crossclaims do not allege a claim for bodily injury, as defined in the State Farm Policy.

68.    The Camino Crossclaims do not allege a claim for property damage, as defined in the State Farm Policy.

69.    The Camino Crossclaims do not allege a claim for personal injury, as defined in the State Farm policy.

WHEREFORE, State Farm seeks a judgment that it has no duty under the Policy to defend and/or indemnify Brown, IDINT and Camino for the claims brought against them in the Underlying Action.

## COUNT II – NO OCCURRENCE

70.    State Farm incorporates herein by reference the allegations set forth in paragraphs 1 through 69 inclusive, as if the same were fully set forth at length.

71.    The State Farm policy responds for bodily injury, personal injury or property damage, caused by an occurrence.

72.    Endorsement FE-3518 and Endorsement FE-7468.4 of the Policy define occurrence as:

> 7.    "occurrence", when used in Section II of this policy, means an accident, including exposure to conditions, which first results in:
>
> a.    bodily injury; or
>
> b.    property damage;

during the policy period. All bodily injury and property damage resulting from one accident, series of related accidents or from continuous and repeated exposure to the same general conditions is considered to be one occurrence.

Occurrence also means the commission of an offense or series or similar offenses which result in personal injury during the policy period.  All personal injury resulting from one offense, series of similar offenses or from continuous or repeated exposure to the same general conditions is considered to be one occurrence.

*See* Exhibit E.

73.     The factual allegations of the Underlying Actions do not allege bodily injury, personal injury or property damage caused by an occurrence as defined in the State Farm Policy.

WHEREFORE, State Farm seeks a judgment that it has no duty under the Policy to defend and/or indemnify Brown, IDINT and Camino for the claims brought against them in the Underlying Action.

## COUNT III - BUSINESS PURSUITS EXCLUSION

74.     State Farm incorporates herein by reference the allegations set forth in paragraphs 1 through 73 inclusive, as if the same were fully set forth at length.

75.     The State Farm Policy does not provide coverage for bodily injury or property damage arising from the business pursuits of any insured.

76.     The State Farm Policy does not provide coverage for personal injury arising from the business pursuits of any insured.

77.     The allegations of the Underlying Action is based upon the publication of a book authored by Brown pursuant to a publishing contract entered into by Brown and Camino for the publication of "Love, Murder, and Corruption in Lancaster County".

78.     Pursuant to his contract with Camino, Brown received compensation for his authorship of "Love, Murder, and Corruption in Lancaster County".

79.     On information and belief, Brown previously published books for compensation prior to writing "Love, Murder, and Corruption in Lancaster County".

80.     The two business pursuits exclusions in the State Farm Policy exclude coverage for the Underlying Action.

WHEREFORE, State Farm seeks a judgment that it has no duty under the Policy to defend and/or indemnify Brown, IDINT and Camino for the claims brought against them in the Underlying Action.

## COUNT IV – INTENTIONAL ACTS EXCLUSION

81.     State Farm incorporates herein by reference the allegations set forth in paragraphs 1 through 80 inclusive, as if the same were fully set forth at length.

82.     The Policy excludes coverage for bodily injury and property damage expected or intended by the insured and/or resulting from the insured's willful and malicious acts.

83.     The allegations of the Underlying Action falls within the intentional acts exclusion of the Policy.

WHEREFORE, State Farm seeks a judgment that it has no duty under the Policy to defend and/or indemnify Brown, IDINT and Camino for the claims brought against them in the Underlying Action.

## COUNT V – SPECIFIC INTENT TO CAUSE HARM EXCLUSION

84.     State Farm incorporates herein by reference the allegations set forth in paragraphs 1 through 83 inclusive, as if the same were fully set forth at length.

85.     The State Farm Policy excludes coverage for personal injury that is caused by acts done with specific intent to cause harm or injury.

86.     The allegations of the Underlying Action alleges that Savage and Bowman suffered damage as a result of Brown's specific intent to cause harm or injury to Savage and Bowman.

87.     The claims in the Underlying Action are excluded from coverage under the Policy.

WHEREFORE, State Farm seeks a judgment that it has no duty under the Policy to defend and/or indemnify Brown, IDINT and Camino for the claims brought against them in the Underlying Action.

## COUNT VI – LIABILITY ASSUMED UNDER A CONTRACT OR AGREEMENT

88.     State Farm incorporates herein by reference the allegations set forth in paragraphs 1 through 87 inclusive, as if the same were fully set forth at length.

89.     IDINT and Camino assert crossclaims against Brown alleging that Brown agreed to hold harmless and defend IDINT and Camino pursuant to the terms of the Publication Agreement dated February 4, 2014 for claims such as those asserted in the Savage and Bowman Complaints.

90.     IDINT and Camino also assert a crossclaim against Brown pursuant to Pa.R.C.P. 1031.1 for indemnification and contribution.

91.     The State Farm Policy contains an exclusion to coverage for personal injury for liability assumed by the insured under a contract or agreement.

92.     The State Farm policy does not provide coverage for the IDINT and Camino Crossclaims against Brown.

WHEREFORE, State Farm seeks a judgment that it has no duty under the Policy to defend and/or indemnify Brown for the claims brought against him in the Underlying Action.

## COUNT VI – PUNITIVE DAMAGES

93.     State Farm incorporates herein by reference the allegations set forth in paragraphs 1 through 92 inclusive, as if the same were fully set forth at length.

94.     The Underlying Action seeks punitive damages against Brown IDINT, and Camino.

95.     Under Pennsylvania law, an insured is not entitled to coverage for punitive damages.

96.     As a result, the claims for punitive damages set forth in the Underlying Action do not fall within the coverage of the Policy, and State Farm has no duty to defend Brown, IDINT and Camino for the claims asserted in the Underlying Action.

97.     Further, State Farm has no duty to indemnify Brown, IDINT and Camino for any punitive damages awarded in the Underlying Action.

WHEREFORE, State Farm seeks a judgment that it has no duty under the Policy to defend and/or indemnify Brown, IDINT and Camino for the claims brought against them in the Underlying Action.

## REQUEST FOR DECLARATORY RELIEF

98.     State Farm incorporates herein by reference the allegations set forth in paragraphs 1 through 97, inclusive, as if the same were fully set forth at length.

99.     An actual and justiciable controversy exists concerning the rights and obligations of the parties under the State Farm Policy at issue with respect to the Underlying Action.

100.    All parties have a claim or interest in the outcome of the declaratory relief sought by this action.

101.    State Farm is entitled to a declaration that it is under no obligation to defend Brown with regard to the claims asserted against him in the Underlying Action.

102.    State Farm is further entitled to a declaration that it has no duty to indemnify Brown with regard to the claims asserted against him in the Underlying Action.

103.    State Farm is further entitled to a declaration that it has no duty to defend IDINT and Camino for the claims asserted against them in the Underlying Action.

20

104.   State Farm is further entitled to a declaration that it has no duty to indemnify IDINT and Camino for the claims asserted against them in the Underlying Action.

WHEREFORE, Plaintiff, State Farm Fire and Casualty Company demands judgment as follows:

    a.   A declaratory judgment that State Farm has no obligation to defend David W. Brown with regard to the claims asserted against him in the Underlying Action;

    b.   A declaratory judgment that State Farm has no obligation to indemnify David W. Brown with regard to the claims asserted against him in the Underlying Action;

    c.   A declaratory judgment that State Farm has no obligation to defend IDINT International Ltd., with regard to the claims asserted against it in the Underlying Action;

    d.   A declaratory judgment that State Farm has no obligation to indemnify IDINT International Ltd with regard to the claims asserted against it in the Underlying Action;

    e.   A declaratory judgment that State Farm has no obligation to defend Camino Books, Inc., with regard to the claims asserted against it in the Underlying Action;

    f.   A declaratory judgment that State Farm has no obligation to indemnify Camino Books, Inc., with regard to the claims asserted against it in the Underlying Action;

    g.   Such other further relief as this Court deems just and proper.

Respectfully Submitted,

BY: _____
     Bradley J. Mortensen (PA 54558)

BY: _____
     Elizabeth A. Sutton (PA 205904)

BY: _____
     Victoria E. Allen (PA 320825)

KENNEDYS CMK LLP
Two Liberty Place

50 South 16th Street, Suite 2625
Philadelphia, PA 19102
Phone: (267) 479-6700
Fax: (267) 479-6710

Attorneys for Plaintiff,
State Farm Fire and Casualty Company

Dated: